NEW ENGLAND CABLE TELEVISION ASSOCIATION, INC., ET AL. *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
(SC 15892)

Callahan, C. J., and Berdon, Norcott, Palmer and McDonald, Js.

96

Argued May 29—officially released September 22, 1998

*Christopher J. Harvie*, pro hac vice, with whom were *Christopher A. Holt, Marti Green, Burton B. Cohen* and, on the brief, *Donna N. Lampert*, pro hac vice, and *Everett E. Newton* and *Anthony J. Dolce*, for the appellants (plaintiff Cablevision of Connecticut, Limited Partnership, et al.).

*Tatiana D. Sypko-Eirmann,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (named defendant).

*David W. Schneider,* with whom were *Michael C. D'Agostino* and, on the brief, *Kathleen A. Carrigan,* for the appellees (defendant SNET Personal Vision, Inc., et al.).

*Phyllis J. Trowbridge,* for the appellee (defendant office of consumer counsel).

*Opinion*

CALLAHAN, C. J. The plaintiffs, Cablevision of Connecticut, Limited Partnership (Cablevision), and Cablevision Systems of Southern Connecticut, Limited Partnership (Cablevision Systems), appeal from the judgment of the trial court dismissing their administrative appeal from a decision of the named defendant, the department of public utility control (department), granting the defendant SNET Personal Vision, Inc. (Personal Vision), a certificate of public convenience and necessity for a statewide franchise to provide community antenna television service, commonly referred to as CATV or cable.[1] The plaintiffs, competing cable providers, contend that the trial court improperly determined that: (1) the department is authorized to issue a

---

[1] All of the incumbent cable operators currently providing service within the state were made parties to the proceedings by the department. Also made parties were the New England Cable Television Association (New England), representing the interests of twenty-two of the incumbent franchisees, and the office of consumer counsel as the statutory representative of consumer interest. See General Statutes § 16-2a. The office of the attorney general and the advisory councils serving each franchise area were granted status as intervenors. Seven of the incumbent franchisees and New England appealed from the decision of the department to the trial court. The only plaintiffs who remain parties to this appeal are Cablevision and Cablevision Systems. References to the plaintiffs throughout this opinion are to Cablevision and Cablevision Systems. The defendants include the department of public utility control, Personal Vision and the office of consumer counsel.

certificate of public convenience and necessity for a statewide franchise; (2) the department was within its authority to exempt Personal Vision from certain regulations; and (3) the department properly conducted the necessary comparison between the terms and conditions contained within Personal Vision's certificate of public convenience and necessity and those of the existing certificates. We affirm the judgment of the trial court.

The following facts and procedural history are undisputed. The department is a state agency authorized pursuant to title 16 of the General Statutes to regulate and supervise the operation of public service companies. As such, it is authorized to certify, regulate and supervise cable operators. Personal Vision, a wholly owned subsidiary of Southern New England Telecommunications Corporation and an operating affiliate of the Southern New England Telephone Company (Southern New England), seeks to provide cable service within Connecticut and is, therefore, subject to certification and regulation by the department. The plaintiffs, two incumbent cable franchisees authorized to provide cable service in two franchise areas located in southwestern Connecticut, will be competitors of Personal Vision.

Pursuant to General Statutes § 16-331 (a),[2] no entity may provide cable services unless the department

[2] General Statutes § 16-331 (a) provides in relevant part: "No person, association or corporation . . . shall construct or operate a community antenna television system without having first obtained a certificate of public convenience and necessity from the Department of Public Utility Control certifying that the person, firm or corporation is qualified pursuant to the provisions of subsection (b) of this section to operate such a service within the territory specified in such certificate. *The department may issue more than one such certificate for any franchise area or portion of a franchise area.* Notwithstanding the provisions of section 33-645, any such certificate shall authorize the holder thereof to occupy public highways to the extent required to provide community antenna television system service. A certificate shall be issued only after written application for the same has been

issues it a certificate of public convenience and necessity. As a result of the limitations of cable technology, franchises to operate cable systems heretofore have been authorized for relatively small, community-based franchise areas. Currently, there are twenty-four franchise areas in Connecticut serviced by twelve operators. To date, the cable operator within each franchise area has enjoyed a monopoly, even though the General Assembly enacted Public Acts 1985, No. 85-509, § 6, which amended § 16-331 (a) to permit competition in the cable industry. Section 16-331 (a), as it incorporates Public Acts 1985, No. 85-509, § 6, provides that "[t]he department may issue more than one such certificate for any franchise area or portion of a franchise area." In more than one decade since the repeal of the monopoly system, however, no effective competition has come to exist in Connecticut's cable industry.[3]

On January 25, 1996, the department received an application from Personal Vision seeking a certificate of public convenience and necessity to provide cable services for the entire state. Prior to Personal Vision's application, the department had never received an application for a statewide franchise. Personal Vision proposed to build out its system at a rate that would provide full cable service to the entire state by the year

made to the department, accompanied by a fee of fifty dollars, and public hearing has been held thereon. No certificate shall be sold or transferred without the approval of the department. For due cause shown, the department may amend, suspend or revoke any such certificate. If a certificate is not exercised within two years from the date of issue, the department may revoke the certificate. The department may specify in the certificate at the time of issue and from time to time thereafter such terms and conditions as the public interest may require." (Emphasis added.)

[3] In 1995, the department granted competing franchises in four franchise areas, but they are not yet operational owing to litigation in which the incumbent franchisees have challenged the certificates of the potential competitors. The failure of these competing franchisees is attributed to litigation by the incumbent franchisees challenging the certificates of these potential competitors.

2009. Personal Vision anticipates meeting this rigorous deployment schedule by employing the hybrid fiber coaxial network of its operating affiliate, Southern New England, a telephone company.

The department conducted extensive public hearings during which it heard from members of the public and the cable industry regarding the issuance of a statewide franchise to Personal Vision. Additionally, the department conducted hearings at which all of the parties and intervenors were provided with the opportunity to present evidence and to cross-examine witnesses. The plaintiffs, having been made parties to the proceedings before the department, fully participated in the hearings. They vigorously opposed authorization of a statewide franchise, as well as certain other terms and conditions of Personal Vision's proposed certificate. The department, by decision dated September 25, 1996, concluded that the grant of a statewide franchise would be beneficial to the public and was within its authority. It, therefore, granted Personal Vision a certificate of public necessity and convenience designating the entire state of Connecticut as its franchise area.

The plaintiffs appealed from the department's decision to the trial court pursuant to General Statutes §§ 4-183 and 16-35 (a).[4] In the trial court, Personal Vision

---

[4] General Statutes § 4-183 (a) provides in relevant part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

General Statutes § 16-35 (a) provides: "Any person, including but not limited to a company, town, city, borough or corporation aggrieved by any order, authorization or decision of the Department of Public Utility Control, except an order, authorization or decision of the department approving the taking of land, in any matter to which such person was or ought to have been made a party or intervenor, may appeal therefrom in accordance with the provisions of section 4-183. Such person so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the department fixes, to pay all costs in case such person fails to sustain such appeal. No municipality or political subdivision shall be

asserted, by way of a special defense, that the plaintiffs were without standing, owing to lack of aggrievement, to raise any claim except those that could be raised pursuant to § 16-331 (g).[5] Section 16-331 (g), commonly denominated as the "level playing field" statute, prohibits the department from issuing a certificate to a competing franchisee that contains more favorable terms or conditions than those applicable to incumbent franchisees. The court concluded that all of the plaintiffs' claims could be addressed within the context of the plaintiffs' § 16-331 (g) claims of unfair competition because they related to their claim that more favorable terms allegedly were afforded to Personal Vision. The court dismissed the plaintiffs' appeal, however, concluding that the certificate of public convenience and necessity granted to Personal Vision did not contravene § 16-331 (g). Specifically, the court concluded that: (1) the grant of a statewide franchise to Personal Vision was within the statutory authority of the department pursuant to § 16-331 (a); (2) the department properly had concluded that the build-out regulations[6] were not applicable to Personal Vision; and (3) the department had conducted a proper comparison between the terms and conditions of the incumbent franchise certificates

determined not to be aggrieved solely because there are other persons who are similarly affected by the order, authorization or decision of the department."

[5] General Statutes § 16-331 (g) provides: "Each certificate of public convenience and necessity for a franchise issued pursuant to this section shall be nonexclusive, and each such certificate issued for a franchise in any area of the state where an existing franchise is currently operating *shall not contain more favorable terms or conditions than those imposed on the existing franchise.* This subsection shall not apply to the length of the term of such certification as may be determined pursuant to subsection (d) of this section." (Emphasis added.)

[6] Section 16-333-13 of the Regulations of Connecticut State Agencies is titled "Minimum construction and extension requirements." It is commonly referred to as the build-out regulation because it governs the method and pace at which a cable provider must provide service within its franchise area, that is, build out its lines. See footnote 12 of this opinion.

and Personal Vision's franchise certificate. The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now § 65-1, and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

I

The plaintiffs first challenge the department's decision to grant a statewide franchise to Personal Vision. They assert that § 16-331 (a) precludes the department from granting a competing franchise that will serve the entire state. See footnote 2 of this opinion. The plaintiffs argue that, pursuant to the terms of § 16-331 (a), the department may issue a certificate to a new competitor to operate only within existing franchise boundaries. According to the plaintiffs, Personal Vision's certificate of public convenience and necessity authorizing a statewide franchise area is, therefore, unlawful because it violates the terms of § 16-331 (a).

Relying on our decision in *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, 235 Conn. 334, 342–43, 663 A.2d 1011 (1995), Personal Vision argues that, owing to a lack of aggrievement, the plaintiffs lack standing to raise the legality of the department's decision to authorize a statewide franchise. The plaintiffs assert that they may challenge the legality of a certificate of public convenience and necessity issued to a competitor either directly under the rationale of *Connecticut State Medical Society* v. *Board of Examiners in Podiatry*, 203 Conn. 295, 524 A.2d 636 (1987),[7]

---

[7] In *State Medical Society* v. *Board of Examiners in Podiatry*, supra, 203 Conn. 300–301, we concluded that physicians have a vested interest in the practice of their profession. We further concluded that physicians may be aggrieved by an act of a regulatory agency that would subject them to illegal or unfair competition in the practice of their profession. Id., 298–304 (podiatry board's allegedly illegal determination that podiatrist may treat ankle aggrieves physician who claims ankle is portion of body to be treated by medical doctor). The plaintiffs argue that, under this rationale, they are

or in conjunction with their right to be free from unfair competition pursuant to § 16-331 (g). We agree with Personal Vision.

"Pleading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. . . . It is [therefore] fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved. . . . [T]he fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision . . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citations omitted; internal quotation marks omitted.) *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 235 Conn. 342–43. For the reasons that follow, we agree with Personal Vision that the plaintiffs lack standing to raise the legality of the issuance of a statewide franchise either directly or under § 16-331 (g) because they lack aggrievement as to that issue.

## A

We recently addressed the issue of an existing competitor's standing to challenge a decision by the department to grant a certificate of public convenience and necessity to a competing cable provider in *United Cable*

aggrieved by and have standing to challenge any act of the department that they believe subjects them to illegal or unfair competition, namely competition in an illegal franchise area.

*Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 235 Conn. 334. In *United Cable Television Services Corp.,* we expressly concluded that an incumbent franchise holder's standing to contest the issuance of a certificate of public convenience and necessity lies exclusively under § 16-331 (g).[8] We determined that § 16-331 (g) was enacted to protect the interests of incumbent cable operators, and it creates in them a vested interest in the right to be free from *unfair* competition. Id., 345. Deprivation of that right by the department's authorization of a certificate of public convenience and necessity that fails to comply with the requirements of § 16-331 (g), therefore, constitutes aggrievement for which the incumbent operators have standing to maintain a cause of action. Id., 346.

Furthermore, we concluded in *United Cable Television Services Corp.* that establishment of aggrievement pursuant to § 16-331 (g) does not afford an incumbent standing to claim that it was aggrieved by the department's alleged violations of other subsections of § 16-331. *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 235 Conn. 353. We concluded "that those statutory obligations of the department are meant to protect the public at large and not the interests of individual competitors. An existing competitor, not being within the zone of interests protected, has no standing to raise claims as to the general fitness of an applicant. . . . [T]he plaintiff has standing *only* to raise claims regarding the terms of competition pursuant to § 16-331 [g], and has no standing to raise claims pursuant to § 16-331 (b), (d) or (h)." (Emphasis added.) Id., 346. In *United Cable Television*

---

[8] At the time *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 235 Conn. 334, was decided, the level playing field statute was designated as General Statutes (Rev. to 1995) § 16-331 (i). It has since been redesignated as § 16-331 (g), but the text remains unchanged. Throughout this opinion, for the sake of clarity, we refer to the level playing field statute as subsection (g).

*Services Corp.*, while recognizing the holding in *Connecticut State Medical Society* v. *Board of Examiners in Podiatry*, supra, 203 Conn. 295, to the effect that competitors may be aggrieved by the action of an agency that subjects them to unfair or illegal competition, we concluded that standing for such claims in the case of incumbent cable operators arises exclusively from § 16-331 (g). That is to say, their claim is limited to allegations that the new competitor's terms, being more favorable, are unfair, and, consequently, are illegal pursuant § 16-331 (g) solely because they are unfair. They cannot claim that the terms of a competitor's certificate of public convenience and necessity are illegal on other statutory grounds. *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 344, 346.

We did not specifically address in *United Cable Television Services Corp.* whether an incumbent could challenge the issuance of a certificate of public convenience and necessity on the basis of a violation of § 16-331 (a) either independently or under the guise of a challenge pursuant to § 16-331 (g).[9] We conclude, however, that the rationale supporting our conclusion of lack of aggrievement under the statutory provisions addressed in *United Cable Television Services Corp.* is equally applicable to a challenge pursuant to § 16-331 (a). In *United Cable Television Services Corp.*, we concluded that the statutory provisions at issue were adopted to protect the public interest, not the interests of incumbent franchisees. Id., 346. Because incumbent franchisees are not representatives of the public, they fall outside the zone of interest to be protected by the statutory provisions of § 16-331, except for subsection (g), which was enacted for their protection. Id. Incumbents are not aggrieved, therefore, by the department's

[9] In *United Cable Television Services Corp.*, we addressed challenges by the incumbent franchise holders pursuant to General Statutes (Rev. to 1995) § 16-331 (b), (d) and (h). No claim was made with respect to legality pursuant to subsection (a).

application, legal or otherwise, of other provisions in § 16-331 in granting competing franchise certificates.

Similarly, the plain language and purpose of § 16-331 (a), a subsection that was not addressed in *United Cable Television Services Corp.*, indicates that the intended beneficiary of that provision is the public at large, not incumbent franchisees. We reach the same conclusion, therefore, with regard to § 16-331 (a). The final sentence of § 16-331 (a) provides: "The department may specify in the certificate at the time of issue and from time to time thereafter such terms and conditions *as the public interest may require.*" (Emphasis added.) This language demonstrates that the department's primary obligation in granting certificates of public necessity and convenience is to protect the public interest. Additionally, the requirement set forth in the first sentence of subsection (a) that the department issue certificates only to those who are qualified to provide service compels the conclusion that the purpose of § 16-331 (a) is to protect the public interest. See *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 346–49.

Furthermore, we conclude that it would be unreasonable to construe § 16-331 (a) as affording protection to incumbent franchisees. When § 16-331 was enacted to permit the department to grant certificates of public convenience and necessity, competition in the cable industry did not exist. At the time of the adoption of Public Acts 1985, No. 85-509, § 6, which amended § 16-331 (a) to permit competition, there was no discussion regarding the need to protect the interests of entrenched incumbent providers. The sole concern was to inject competition into the cable industry in compliance with federal mandates. See 28 S. Proc., Pt. 15, 1985 Sess., pp. 5024–31; 28 H.R. Proc., Pt. 27, 1985 Sess., pp. 9721–42. It was not until 1992, with the adoption of

Public Acts 1992, No. 92-137, § 5, which amended § 16-331 to add the present subsection (g), that the legislature evidenced an intent to protect the interests of incumbent cable providers.[10] See 35 S. Proc., Pt. 4, 1992 Sess., pp. 1422–25; 35 H.R. Proc., Pt. 13, 1992 Sess., pp. 4182–4226. Section 16-331 (a) permits competition in the cable industry. No rational reading of § 16-331 (a) could lead to the conclusion that it should be construed as protecting the interests of an incumbent franchisee *from* competition, statewide or otherwise. Instead, the legislature adopted subsection (g) exclusively and explicitly for the protection of the incumbent franchisees. Their aggrievement exists, therefore, if at all, solely under that provision. See *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 235 Conn. 346.

B

We also disagree with the plaintiffs' argument that we must determine the legality of a statewide franchise

[10] The level playing field provision was included in Public Acts 1992, No. 92-137 because that act permitted municipalities to enter the market as cable providers. Many legislators were concerned that permitting the public sector to compete with the private sector carried with it inherent and substantial competitive advantages. The level playing field provision was incorporated to allay those fears. 35 H.R. Proc., Pt. 13, 1992 Sess., pp. 4188–89, remarks of Representative J. Peter Fusscas; id., pp. 4201–4202, remarks of Representative Leslie T. Young; id., pp. 4213–14, remarks of Representative Andrew M. Norton; id., pp. 4220–22, remarks of Representative Christopher B. Burnham. Notwithstanding this limited purpose, we have concluded that the plain language of § 16-331 (g) does not limit its applicability solely to municipal competitors. *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* supra, 235 Conn. 354 n.14. The purpose of the act is instructive, however, in informing our consideration of the scope of the legislature's intended reach of the statute. It appears from the legislative history that the legislature's goal was to avoid gross disparity in competition, not minute distinctions between competitors, which are attributable more to the reality of an entity's capability than to the terms and conditions that are adopted. See *Vernon Village, Inc.* v. *Carothers,* 217 Conn. 130, 139–40, 585 A.2d 76 (1991) (" 'it is appropriate for this court to construe the statute . . . in furtherance of the legislature's purpose and objectives' " even if it requires departure from literal meaning of plain language).

pursuant to § 16-331 (a) because permitting Personal Vision to receive an illegal franchise would constitute unfair competition pursuant to § 16-331 (g). In essence, the plaintiffs argue that it would be unfair to permit Personal Vision the advantage of an illegal franchise issued in excess of the department's authority when the plaintiffs must suffer the disadvantages of a legal franchise. To resolve this issue of fairness, and to ascertain if there has been a violation of § 16-331 (g), it is necessary, according to the plaintiffs, first to determine if they are correct in their assertion that the authorization of a statewide franchise is illegal.

This back door effort to obtain review of a nonreviewable issue is precisely the argument we rejected in *United Cable Television Services Corp. v. Dept. of Public Utility Control*, supra, 235 Conn. 334. There, we concluded that the incumbent franchisees could not challenge the department's decision as to other subsections of § 16-331 as illegal interpretations of the statute under the guise of an allegation of unfair competition pursuant to § 16-331 (g). Id., 355. We concluded that, as a general rule, the creation of competition does not constitute aggrievement to an existing competitor. Id. Section 16-331 (g) creates an express statutory exception to this general rule, which is limited to an analysis of whether the terms and conditions of the competing franchise are more favorable than those of the incumbent franchise. We said that "[g]iven this limited exception to the general rule, the scope of the substantive determination is limited by the scope of the standing that created it." Id., 355–56. The rationale underlying this conclusion was the presumption in favor of creating competition. We noted that "[i]f the plaintiff or any other existing competitor were allowed to claim injury pursuant § 16-331 [g] and then obtain judicial review of all claims arguably affecting competition, there would no longer be a general rule favoring free market

competition. In this case, the plaintiff has established aggrievement only as to the level playing field provision and, therefore, may not appeal other issues as the court has no subject matter jurisdiction over those issues." Id., 356.

Moreover, we need not address whether the allegedly illegal application of § 16-331 (a) subjects the plaintiffs to an unfair disadvantage because we reject the plaintiffs' initial presumption that the territorial limits of their franchise certificates are created pursuant to a proper interpretation of the law while Personal Vision's certificate is not. The real source of the plaintiffs' angst, however, is not that they are subject to any limitations to which Personal Vision is not subject, but that they were subject to a different law when they applied for certificates than the law that was operative when Personal Vision applied. Currently, however, the plaintiffs may derive the same benefit from the department's interpretation of § 16-331 (a) as Personal Vision receives. The department has concluded that § 16-331 (a) permits issuance of a statewide franchise to any qualifier, and, as both the department and the trial court indicated, the plaintiffs have been entitled to pursue authorization for statewide franchises since 1985. Consequently, the plaintiffs and Personal Vision are subject to the same legal requirements.

The fact that the plaintiffs were limited to community-based franchise areas when they applied for their franchises was the result of a regulatory scheme dictated by the limitations of the technology at that time and a noncompetitive industry. Evolving technological capability and a statutory amendment authorizing competition make the issuance of a statewide franchise possible and desirable. Contrary to the plaintiffs' assertion, this is not the equivalent of one entity being subject to one interpretation of the law while another is subject to a different interpretation of the same law. Rather, it is a

situation in which the law has changed to permit differ-
ent results. Having failed to pursue an opportunity for
a statewide franchise, the plaintiffs cannot now blame
the department for the perpetuation of their commu-
nity-based franchise areas, nor may they properly
accuse the department of wrongfully treating them dif-
ferently than it has treated Personal Vision. See gener-
ally *United Cable Television Services Corp.* v. *Dept. of
Public Utility Control*, supra, 235 Conn. 359 (incumbent
may not voluntarily assume obligation, then claim
unfair competition). Although we recognize that the
plaintiffs will be subject to additional regulatory pro-
ceedings if they now choose to pursue a statewide fran-
chise, we do not consider this tantamount to an unfair
advantage to Personal Vision, which, itself, presently
is subjected to significant regulatory proceedings in
pursuit of its own statewide franchise. Consequently,
we are not persuaded that Personal Vision enjoys the
advantage of an illegal franchise while the plaintiffs are
burdened by the strictures of a legal one.

In sum, we conclude that the plaintiffs are not
aggrieved with respect to the issue of the *legality* of
the issuance of a statewide franchise. As incumbent
franchisees, they may assert that the authorization of
a statewide franchise constitutes a more favorable term,
which is prohibited pursuant to § 16-331 (g), as com-
pared to their own certificates which, presently, are
limited to community-based franchise areas. See part
III C of this opinion. They may not, however, simply
raise the issue of whether the grant of a statewide
franchise is legal pursuant to § 16-331 (a) either directly
or under the guise of a § 16-331 (g) unfair competition
claim.[11]

---

[11] The trial court addressed the issue of the legality of the issuance of a
statewide franchise and concluded that it is legal. The trial court mistakenly
considered the review necessary in light of the plaintiffs' right to be free
of unfair competition pursuant to § 16-331 (g). It is unnecessary to address

## II

The plaintiffs next argue that they are aggrieved by the department's failure to require Personal Vision to comply with a certain mandatory regulation purportedly applicable to all franchise holders. Regs., Conn. State Agencies § 16-333-13.[12] This regulation, commonly referred to as the build-out regulation; see footnote 6 of this opinion; mandates specific time frames in which a cable provider must extend service within its franchise area. As in part I of this opinion, we conclude that the plaintiffs lack standing to raise that regulation as an independent issue. A review of § 16-333-13 demonstrates that the plaintiffs are not within the zone of interest protected by that regulation, and, therefore, they are not aggrieved by its alleged misapplication.

that issue in light of our conclusion that the plaintiffs lack standing to challenge the legality of a statewide franchise, even pursuant to § 16-331 (g).

[12] Section 16-333-13 of the Regulations of Connecticut State Agencies provides in relevant part: "(a) Definitions:

"(1) Franchise holder as used in this section means any CATV operator authorized to do business by the Public Utilities Control Authority. . . .

"(b) Mandatory construction:

"(1) Each franchise holder shall, within six months of award of a certificate of public convenience and necessity (franchise) or within six months of the effective date of these regulations, whichever is later, commence construction of the CATV system unless a longer period of time is deemed reasonable by the DPUC.

"(2) Each franchise holder shall, within one year of commencing construction, complete construction of energized trunk and feeder throughout the primary franchise area, without regard to aerial or underground plant.

"(c) Obligation to extend:

"(1) Each franchise holder shall, within one year of completion of the required construction in the primary franchise area, complete construction of energized trunk and feeder to all areas where there are at least 70 R.D.U.'s per aerial plant mile of extension, at no charge to subscribers.

"(2) Each franchise holder shall, upon completion of the construction required in c. 1. above, extend energized trunk and feeder, at no charge, to all areas within the franchise territory where there are at least: 1) 25 prospective subscribers per aerial plant mile extension or 2) 50 prospective subscribers per underground plant mile of extension. The construction required by this section shall be completed at a rate specified in the company's tariffs, filed pursuant to subsection (d) of these regulations and approved by the DPUC. . . ."

The fundamental policy to be accomplished by mandating line extension has been to achieve universal service for the public. The pace established in the line extension regulation was set to strike a balance between providing service to as many customers as possible within the least amount of time while protecting the financial health of the cable provider. Thus, the zone of interest that the regulation contemplates protecting includes only the public and the franchisee to which the regulation applies. It is not possible to construe the regulation as being intended to protect the interests of an incumbent franchisee against a competitor. Indeed, such a conclusion would be absurd in light of the fact that § 16-333-13 was promulgated and approved in 1978, seven years prior to the introduction of competition in the cable industry.[13] Consequently, we conclude that the plaintiffs, as competing franchisees, are not aggrieved by the department's decision. They have no standing, therefore, to challenge the department's conclusion that the build-out regulation does not apply to Personal Vision.[14] They may be heard to complain only that the inapplicability of the build-out regulation to Personal Vision constitutes a more

[13] The regulation was amended in 1980 to reflect minor changes and has remained unchanged since 1980, five years prior to the introduction of competition.

[14] The department concluded that the regulation was not applicable because it applies to franchise holders who must construct energized trunk and feeder lines. Personal Vision will be employing a hybrid fiber coaxial cable system constructed by its operating affiliate, Southern New England, and will not, therefore, be constructing any system. Furthermore, the hybrid fiber coaxial system is not equivalent to an energized trunk and feeder system. The department concluded that the regulation, initially adopted in 1978, was simply inapplicable because technological advances had rendered the regulation obsolete. The department indicated in its decision that it intends to amend the regulation to reflect the changing regulatory landscape. The department did conclude that the spirit of the regulation applied to Personal Vision and was adequately achieved. Personal Vision's service will extend at a rate that is, in some circumstances, ten times greater than that of the plaintiffs. Universal service by Personal Vision will be a reality before it is achieved by some incumbents.

favorable condition in violation of § 16-331 (g). See part III B of this opinion.

## III

Finally, the plaintiffs argue that the department has failed to conduct an adequate comparison, in accordance with § 13-331 (g), between the terms and conditions of the certificates of the incumbent franchisees and those contained in Personal Vision's certificate.[15] See footnote 5 of this opinion. The level playing field statute, as subsection (g) is denominated, requires that the department, when granting a competing franchise, not authorize a certificate with more favorable terms than those applicable to the existing franchises. According to the plaintiffs, if a new franchise is authorized to permit competition in multiple existing franchise areas, the department must make a point by point comparison of the terms and conditions contained in the certificates of each of the several incumbent franchisees with which the new franchisee will compete. They argue that the department is obligated to conduct a market specific inquiry to determine the impact of the new competitor's terms in each of the existing franchise

---

[15] Personal Vision argues that review of this claim is precluded for lack of an adequate record because the plaintiffs have failed to submit their original certificates containing the relevant terms and conditions to which they are subject. The absence of those certificates renders the record inadequate for review because it is impossible to determine whether the terms and conditions of the competing franchisees' certificates are more favorable. *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 356–59. The plaintiffs submitted a summary of their franchise obligations, which, however, was not inclusive and copies of their draft agreements, which had not been approved by the department at the time of the decision in this case. The plaintiffs assert that their obligations pursuant to their original certificates were delineated in several department decisions that were part of the record. In *United Cable Television Services Corp.*, we expressly left open the question of whether the incumbent could include a reasonable substitute for its franchise agreement. Id., 358. We need not resolve that issue here in light of our conclusion in favor of Personal Vision that the department's review was adequate.

areas. The plaintiffs assert that because the department failed to conduct such an inquiry, the comparison failed to meet the requirements of § 16-331 (g).[16] We disagree.

Nothing in the text of § 16-331 (g), nor in our interpretation of § 16-331 (g) in *United Cable Television Services Corp.*, mandates a market specific inquiry or a point by point analysis of each competitor's terms. We concluded in *United Cable Television Services Corp.* that the department must consider the entire package of terms and conditions applicable to the incumbent franchisee compared with those of the new competitor. *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 360. It is the effect of the totality of the terms that controls the determination of whether one certificate is more favorable than another. The obligation to assess the totality of the terms is antithetical to the notion of term for term parity and market specific analysis. We expressly concluded in *United Cable Television Services Corp.* that singular differences between comparable terms do not constitute a per se violation of the level playing field statute. Id. Where one term may be construed as more favorable, another term that is less favorable may fill the gap to leave the terms and conditions of the certificate, on balance, no more favorable than that of the existing franchisee.[17]

---

[16] To the extent that the department may have failed to apply properly the statute for incumbent franchisees other than the plaintiffs, we do not address those claims as the plaintiffs would have no standing to raise issues relating to the aggrievement of their fellow incumbents pursuant to § 16-331 (g). Our review is limited to the lack of adequate comparison, if any, between the terms and conditions of the plaintiffs' certificates and that of Personal Vision.

[17] The legislative history supports this conclusion. In assessing the level playing field provision, Representative Andrew M. Norton recognized that municipalities that seek a franchise to compete in providing cable services might have certain tax advantages not available to an incumbent franchise who operates in the private sector. The incumbent franchisees could make up for that disadvantage, however, with economy of scale advantages. 35 H.R. Proc., Pt. 13, 1992 Sess., p. 4212. The accuracy of Representative Norton's

Likewise, where a new competitor is competing against several incumbent competitors, an apparent competitive advantage against one may be negated by a competitive disadvantage against another. Consequently, the department may consider the totality of the terms and conditions applicable to all of the incumbents rather than a term for term market specific inquiry. The market specific inquiry advanced by the plaintiffs would force Personal Vision to operate with terms and conditions equivalent to the lowest common denominator. This would place Personal Vision at a competitive disadvantage in relation to other incumbents that have more favorable terms and conditions. We will not adopt an interpretation of the *level* playing field statute that would produce such a result. See *State* v. *Stevens*, 224 Conn. 730, 737, 620 A.2d 789 (1993). Placing entering competitors at such a disadvantage would be contrary to the overriding legislative objective that there be effective competition in the cable industry.[18] See 35 S. Proc.,

assessment of relative advantages aside, the relevance of this example is that it demonstrates that such broad based comparisons were intended.

[18] With federal deregulation of the cable industry in 1985, the General Assembly was faced with the need to cease rate setting for a monopolistic industry. In the absence of rate regulation, the only effective means of controlling rates is through effective competition. Since that time, it has been the primary objective of the legislature to achieve effective competition for the protection of consumers. 35 S. Proc., Pt. 4, 1992 Sess., pp. 1422–25; 35 H.R. Proc., Pt. 13, 1992 Sess., pp. 4181–4226. In the decade and one half since deregulation, legislators have been concerned that this objective has been defeated and consumers have endured what the legislature perceived to be significant and unreasonable price increases from unfettered incumbent cable monopolies. 35 H.R. Proc., supra, p. 4201, remarks of Representative Leslie T. Young; id., p. 4203, remarks of Representative Raymond M. H. Joyce; id., p. 4206, remarks of Representative David Lavine; id., p. 4214, remarks of Representative Andrew M. Norton; id., p. 4221, remarks of Representative Vincent J. Tonucci ("to the best of my knowledge, in the past five years since we've been unregulated, deregulated, the prices have gone up 100 [percent]"); id., p. 4223, remarks of Representative Michael A. Caron (constituents angered by 50 percent increase in bill with no concomitant increase in service). We will not adopt an interpretation of § 16-331 (g), which was enacted in conjunction with the legislature's efforts to ensure competition, that would undermine that legislative purpose.

Pt. 4, 1992 Sess., pp. 1422–25; 35 H.R. Proc., Pt. 13, 1992 Sess., pp. 4181–4226; 28 S. Proc., Pt. 15, 1985 Sess., pp. 5024–5031; 28 H.R. Proc., Pt. 27, 1985 Sess., pp. 9721–42. We conclude, therefore, that a market specific inquiry of each term within each incumbent's certificate is not required pursuant to § 16-331 (g), and the department properly looked to the totality of the terms in all incumbent franchise certificates.

The department's analysis went well beyond a general comparative inquiry, however. It addressed each claim of unfair competition raised by each incumbent franchisee and concluded that none of the claims so raised amounted to an unfair advantage to Personal Vision. By addressing specific concerns raised by each incumbent, the department did conduct a market specific inquiry, which was sufficient to ensure that no unfair advantage existed within a given franchise area.[19] The fact that the department did not evaluate whether term for term parity would exist within each franchise area is of no moment. Such parity is not required, and an inquiry in that regard would have been gratuitous. After addressing the specific terms at issue, the department went on to assess the totality of the terms and conditions applicable to the incumbents and concluded that, on the whole, Personal Vision's franchise certificate was not more favorable than the certificates of any of the existing competitors or all of them combined.[20] We

---

[19] The trial court noted that "[t]he plaintiffs did not present any specific franchise agreement in juxtaposition to [Personal Vision's] franchise. The claims emphasized specific terms [of Personal Vision's franchise] and contrasted them with general conditions of [the] incumbents or [the] specific terms of various franchisees. The plaintiffs' approach invited if not dictated the type of analysis used by the [department]." We agree with the trial court. If an incumbent fails to raise a particular issue, it cannot be heard to complain later that the department did not adequately address that issue. This is particularly true where, as here, the incumbent franchisees have failed to submit their original certificates of public convenience and necessity with any applicable amendments.

[20] Our review of the department's decision reveals that it conducted a point by point analysis of each issue specifically raised by the incumbent

conclude that this comparison methodology comports with the requirements of § 16-331 (g), as interpreted in *United Cable Television Services Corp.*

The department's determination that Personal Vision's certificate does not contain more favorable terms than those of the incumbents contain is primarily a factual conclusion.[21] Our review of an agency's factual determination is constrained by General Statutes § 4-183 (j), which mandates that a court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . ." This limited standard of review dictates that, "[w]ith regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute

franchisees. It also conducted a general analysis of all of the terms and conditions of the certificates of the individual incumbents and of Personal Vision. In its decision, the department stated that it "discusses the specific terms and conditions of [Personal Vision's] franchise that the incumbent providers claim are more favorable; upon completion of all such analysis, the [d]epartment engages in a review of the entire package of terms and conditions applied on [Personal Vision] as compared to the entire package of terms and conditions imposed on the incumbent providers."

[21] Although the interpretation of a statute is a question of law, the department's legal conclusion that a market specific term by term comparison is not required comports with our conclusion to that effect in *United Cable Television Services Corp.* Consequently, the department's findings of fact, and the application of those facts to the law as articulated in *United Cable Television Services Corp.*, are entitled to deference. We have said that "[c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . *New Haven* v. *Freedom of Information Commission*, 205 Conn. 767, 774, 535 A.2d 1297 (1988)." *Cannata* v. *Dept. of Environmental Protection*, 239 Conn. 124, 139–40, 680 A.2d 1329 (1996).

its judgment for that of the administrative agency." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 219 Conn. 51, 57, 591 A.2d 1231 (1991); see also *DiBlasi* v. *Zoning Board of Appeals,* 224 Conn. 823, 829–30, 624 A.2d 372 (1993). An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission,* 225 Conn. 731, 744, 626 A.2d 705 (1993); *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* supra, 57. Substantial evidence exists if "the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.) *Connecticut Building Wrecking Co.* v. *Carothers,* 218 Conn. 580, 601, 590 A.2d 447 (1991); *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* supra, 57. This "substantial evidence" standard is highly deferential and permits less judicial scrutiny than a "clearly erroneous" or "weight of the evidence" standard of review. *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 216 Conn. 627, 640, 583 A.2d 906 (1990). The burden is on the plaintiffs to demonstrate that the department's factual conclusions were not supported by the weight of substantial evidence on the whole record. See id.; *Office of Consumer Counsel* v. *Dept. of Public Utility Control,* 246 Conn. 18, 36–37, 716 A.2d 78 (1998).

The plaintiffs assert three separate arguments to support their claim that the terms and conditions of Personal Vision's franchise are more favorable than their own. First, they argue that the terms and conditions relating to public access are more favorable. Second, they assert that the failure to apply the build-out regulations to Personal Vision gives it a competitive advantage. Finally, they contend that Personal Vision's statewide franchise is inherently unfair because it

affords Personal Vision certain economies of scale not available to incumbents. We are not persuaded by any of the plaintiffs' arguments.

## A

The plaintiffs first claim that the public access requirements imposed on Personal Vision are far more favorable than their own. Cable providers are required to provide cable access to the community they serve by providing a local studio within their franchise area to accommodate community programming. Additionally, franchisees must dedicate certain stations to public access programming and must provide financial and technical support to members of the community in creating this programming. Cable operators may provide this community access either through their own facilities or by an independent not-for-profit access provider.

Personal Vision's certificate, as approved by the department, mandates that Personal Vision, though holding only a single franchise, must provide community access based on the currently existing franchise boundaries. Personal Vision will be obligated to build at least one centrally located studio or to contract with an independent provider to construct and operate such a facility.[22] It may fulfill its obligation to provide community access within the twenty-four franchise areas either by interconnecting with existing studios operated by the incumbent franchisees, contracting with an existing

[22] In a subsequent decision dated February 25, 1998, the department concluded that Personal Vision will be obligated to provide its own statewide facility as applications by three independent providers have been denied and the department has ruled that Personal Vision must provide its own facility. Dept. of Public Utility Control Docket No. 96-01-24, p. 17. The plaintiffs assert that the department has violated Practice Book § 67-10, formerly § 4064J, by providing additional arguments while bringing this new decision to our attention. We disagree. The department's explanation of the relevance of this decision was appropriate pursuant to § 67-10. We conclude, however, that this new information has no impact on our conclusion.

independent provider, or by building an additional studio in each franchise area where interconnection is not possible. It must also contribute $5 per subscriber to support community access. The plaintiffs take issue with each of these obligations.

The plaintiffs argue that the ability of Personal Vision to interconnect with existing studios rather than being required to construct their own facility in each franchise area provides an unfair competitive advantage. We do not agree that this difference is more favorable to Personal Vision than to the plaintiffs. The use of interconnection rather than building and operating additional facilities within the same franchise area is not necessarily a competitive advantage. Evidence before the department indicated that it might, in fact, be less expensive to construct twenty-four separate facilities than to effectuate interconnection in each area. Moreover, Personal Vision is obligated to contribute $5 per subscriber for community access purposes in addition to its obligation to pay for the cost of interconnection.[23] Conversely,

[23] The plaintiffs also assert that the $5 per subscriber contribution requirement is a more favorable term because some incumbents must pay significantly more. The department found that the cost to incumbents for public access contributions ranged roughly between $1.84 through $8.40 per subscriber. The department found that the plaintiffs contribute $1.84 and $4.49 per subscriber, both less than the $5 contributed by the Personal Vision. Consequently, the department reasonably could have concluded that the payment of $5 per subscriber is not a more favorable term than those applicable to the plaintiffs. We also note, however, that the department concluded that it was not practical to conduct a concomitant analysis of community access obligations. Pursuant to General Statutes § 16-331a (k), as it incorporates Public Acts 1995, No. 95-150, the legislature directs that community access contributions should be $5 per subscriber and permits up to a 40 percent annual adjustment by the department. The incumbent franchisees were subject to regulations that were adopted prior to the 1995 amendment and that used criteria other than a fixed dollar amount. Although the incumbent franchisees were entitled to apply for a change in their community access support obligations to comport with the amendment, no incumbent had applied to do so. As we concluded in *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 359, we cannot permit an incumbent provider voluntarily to accept the continuation

if Personal Vision were to construct its own facilities, it would be permitted to offset the cost of construction against the $5 per subscriber contribution. The department concluded that because the markets could not sustain multiple facilities, it was preferable to permit interconnection to avoid waste, which would be contrary to the public interest.[24]

Moreover, the use of interconnection with a facility operated by an entity other than the franchise holder is not a new privilege exclusive to Personal Vision. At least five of the incumbent operators utilize an independent provider to meet their community access obligations. Although the plaintiffs have built their own facilities, there was no reason they could not have chosen the same interconnection options that are available to other franchisees.[25]

Contrary to the plaintiffs' assertions, Personal Vision is subject to the same community access facility requirements as any incumbent franchise holder, namely, that it provide one public access facility within the boundaries of its franchise territory, i.e., the state. The plaintiffs, though operating affiliates, are two separate cable

of an obligation and use that voluntary act to support an argument that a competitor has been given more favorable terms.

[24] The fundamental purpose underlying the legislative authorization of competition in the cable industry is to further the public interest. It is that paramount interest that the department is directed to protect. The protection of the interest of incumbent competitors is a legitimate obligation of the department, but may not supersede the interest of the public. To place the interests of competitors above the interest of the public would render the "general rule favoring free market competition" pursuant to § 16-331 a virtual nullity. *United Cable Television Services Corp.* v. *Dept. of Public Utility Control*, supra, 235 Conn. 356. We conclude, therefore, that in adopting § 16-331 (g) the legislature could not have intended to permit the department to act contrary to the public interest in order to protect speculative interests of competitors.

[25] The fact that there were no independent community access providers within their regions is of no moment. They, like Personal Vision, could have sought such a provider.

providers endowed with two distinct franchise certificates to serve two separate franchise areas. Consequently, they were obliged to provide two public access facilities. Personal Vision, however, is obliged to provide community access in each of the existing cable franchise areas. Personal Vision must bear the expense of providing public access opportunity in twenty-five locations throughout its franchise area either through its own facility or through interconnection. Either alternative carries a substantial economic burden. No such concomitant burden is placed on the incumbent franchisees. We conclude that the community access terms applicable to Personal Vision are not more favorable than those applicable to the plaintiffs. To the contrary, the terms and conditions of Personal Vision's franchise certificate regarding community access impose a substantially greater burden than the concomitant obligations of any existing franchisee.

## B

The plaintiffs next argue that the failure to apply the build-out regulations to Personal Vision constitutes an unfair advantage. We disagree. Personal Vision is obliged to provide service to the entire state within eleven years. It will be required to provide services to certain areas of the state prior to the incumbent franchisees in some of those same areas. Moreover, Personal Vision's build-out obligations exceed those of most incumbents in their substantially smaller franchise areas. Personal Vision's pace of construction will range from 99 to 268 miles per month. By contrast, the department found that between 1981, after the current build-out regulation became effective, and 1995, the incumbent franchisees extended at a rate ranging between eight-tenths of one mile and 20 miles per month, averaging 7 miles per month. The plaintiffs, themselves, extended at a rate of 20 and 13.3 miles per month. On average, it took over twelve years for those incumbents

who, so far, have completed construction, to serve their franchise areas fully. The plaintiffs took seven and ten years to complete build-out, but had the advantage of small, densely populated franchise areas. We, therefore, do not agree that the pace of extension imposed on Personal Vision constitutes an unfair advantage.

The plaintiffs also argue that the failure to apply the build-out regulation provides an advantage to Personal Vision by permitting it to operate first in less densely populated regions where higher incomes prevail. The plaintiffs assert that this will enable Personal Vision to engage in the prohibited practices of "cream skimming" and "redlining," that is, operating in the most lucrative markets while avoiding the burden of building in less lucrative markets. The department concluded that this was not a potential problem. It found that the incentive is for cable providers to serve the more densely populated areas because the greater number of potential subscribers provides the best economic advantage. Moreover, the department concluded that Personal Vision's build-out plan was not based on "cream skimming" and "redlining" considerations. Rather, Personal Vision's build-out is constrained by the decisions of its operating affiliate, Southern New England, which is responsible for building the system on which Personal Vision will operate. The department reasonably concluded that the inapplicability of the build-out regulations will not provide a competitive advantage to Personal Vision. This condition in its franchise certificate neither permits Personal Vision to skim nor to extend its lines at a slower pace than did the incumbents.[26]

## C

The plaintiffs next argue that the statewide franchise, which is a term in Personal Vision's certificate of public

---

[26] The plaintiffs' argument that the mere illegality of the failure to apply the regulation constitutes an unfair competitive advantage is akin to that

convenience and necessity, provides Personal Vision an unfair advantage because it permits economies of scale that are not available to franchise holders that operate in more limited franchise areas. The primary inequity pointed to by the plaintiffs is that they have two franchise certificates in contiguous franchise areas, but are obliged to operate them separately because the department has denied their request to treat the two areas as one in several respects that would have enabled them to eliminate certain duplicative accounting and administrative costs. The plaintiffs argue that because Personal Vision's territory encompasses multiple franchise areas, it will enjoy operating efficiencies and economies of scale including, for example, a singular administrative system and marketing advantages.

Whether the plaintiffs are correct in their assertion that the statewide franchise creates an advantage, their argument founders in that they are comparing, to use a colloquialism, apples to oranges. Although the plaintiffs are closely related operating affiliates, they are two distinct operators in two distinct franchise areas. By contrast, Personal Vision is a single operator with a single franchise. If certain economies of scale inure for that reason, it is no different than if one operator is located in a wealthy locale while another is operating in an impoverished locale.[27] There is nothing in the law that prevents the plaintiffs, or any incumbent franchisee, from seeking a statewide franchise or from petitioning to expand their existing franchises. Indeed, the department has expressly invited them to do so.

presented in part I B of this opinion, relating to the issuance of a statewide franchise. We reject it for the same reason that we rejected that argument.

[27] The trial court noted that there are certain benefits that inherently inure to the plaintiffs' status as incumbents that serve to offset the inherent advantages applicable to a statewide franchise. The plaintiffs were quick to argue that any inherent benefit attendant on their status as incumbents is not a proper consideration under § 16-331 (g) because it is not one of the "terms or conditions" of their certificate. While we disagree with this argument, we cannot help but recognize its inconsistency. The innate bene-

Furthermore, the department concluded that the possibility of operational efficiencies and economies of scale are too speculative to be an adequate basis for a decision to deny Personal Vision's franchise pursuant to the level playing field requirement. Additionally, it concluded that if such economies do exist, they are likely to be offset by disadvantages. Finally, if Personal Vision does reap some benefit from increased economies of scale, the department concluded that the advantage is no more than an appropriate return for the increased financial risk that Personal Vision will bear in engaging in this project. We agree with the department's conclusion. It is reasonable to believe that, for example, whatever advantage Personal Vision may gain in marketing to a larger, statewide market it may well loose by its obligation to provide such extensive community access support.

The department has concluded that, on the whole, Personal Vision's certificate to operate a statewide franchise will not be more favorable than the certificates of the incumbent franchise area providers. There is substantial evidence in the record to support that conclusion. Accordingly, even if we were inclined to disagree with the department, which we are not, we cannot substitute our judgment for the department's in arriving at this factual conclusion.

Finally, we note that the right to fair competition afforded by § 16-331 (g) guarantees incumbents a level playing field, not a winning team. Advances in technology will provide competitive advantages against which the department cannot and should not legislate. If the rules of competition have changed and Personal Vision has a technological advantage that will permit it to

---

fits that inure in a large, single franchise are no more "terms and conditions" of the defendant's certificate than is the benefit of incumbency.

provide cable service in a manner not previously possible, it should not be hobbled by the technological limitations of its competitors or because the franchise agreements of incumbent competitors are limited by the fact that they were authorized only for community-based areas during an era in which there was no competition. The department's sole duty pursuant to § 16-331 (g) is to ensure that the specific terms of a competitor's certificate are not, on balance, more favorable than those of the incumbents. The department is obligated to tailor the terms and conditions so as best to serve the public interest, while striving to prevent institutional advantages for new competitors. It is not permitted, however, to stifle competition, which is in the best interest of the public, for the protection of incumbent providers who are not yet ready to meet the challenge of competition because they have not taken advantage of the present regulatory scheme.

The judgment is affirmed.

In this opinion the other justices concurred.